859 F.2d 1078
 57 USLW 2279
 UNITED STATES of America, Appellee,
v.
Joseph N. GALLO, Joseph Armone, Joseph Corrao, Robert
DiBernardo, James Failla, Joseph Zingaro, Thomas Agro,
Robert Desimone, Jack Giardano, Angelo Ruggiero, Anthony
Vitta, George Daly, Louis Giardina, Salvatore Migliorisi,
Julie Miron, Mildred Russo, Defendants,
Julie Miron, Defendant-Appellant.
 No. 560, Docket 87-1379.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 4, 1988.
Decided Sept. 22, 1988.
 
 Lawrence H. Tribe, Cambridge, Mass. (Brian Koukoutchos, Cambridge, Mass., Andrew M. Lawler and Sharon D. Feldman, New York City, of counsel), for defendant-appellant.
 Douglas E. Grover, Sp. Atty., Brooklyn Strike Force, Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., Deborah Watson, Dept. of Justice, Washington, D.C., Laura Ward, Sp. Atty., Brooklyn Strike Force, Brooklyn, N.Y., of counsel), for appellee.
 Before VAN GRAAFEILAND, WINTER and ALTIMARI, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal raises in stark form the question of under what circumstances a defendant is entitled to a dismissal of an indictment where his fifth amendment rights have been violated by the inadvertent inclusion of prior immunized testimony in an application for electronic surveillance that led to evidence of his criminality.
 
 
 2
 Julie Miron testified under a grant of immunity before a grand jury looking into the activities of now-convicted labor-racketeer John Cody. A paragraph of Miron's testimony was erroneously included in a lengthy application for an extension of an electronic surveillance authorization in the home of the late Paul Castellano. The surveillance eventually uncovered a labor payoff scheme implicating Miron. The paragraph containing the immunized testimony was so inconsequential, however, that it could not have influenced the government's decision to seek or the district judge's decision to issue the surveillance order. Because inclusion of the paragraph did not affect the course of events leading to Miron's conviction, I would affirm the judgment of conviction.
 
 BACKGROUND
 
 3
 In March 1980 the Organized Crime Strike Force of the Eastern District of New York obtained an order compelling Julie Miron, the president of several building supply corporations, to testify before a grand jury investigating John Cody, a former labor official with suspected ties to organized crime. Miron's testimony was given under a grant of immunity pursuant to 18 U.S.C. Sec. 6002 (1982), following Miron's assertion of his fifth amendment privilege in response to the question: "Do you know John Cody?"
 
 
 4
 On June 18, 1980, Miron appeared before the grand jury and answered questions about the union contracts of his building supply companies, his relationship with John Cody, and his relationship with the late Paul Castellano, the alleged boss of the Gambino organized crime family. Miron testified that one of his companies had a contract with a union headed by Cody and that he had other business dealings with Cody and Cody's son. Miron also testified that his companies had supplied building materials to Castellano's sons and that he met with Castellano and John Cody at a Manhattan restaurant to resolve a dispute about the price of those materials.
 
 
 5
 The grand jury investigation culminated in the indictment and conviction of Cody on labor-racketeering charges. Although Miron did not testify at Cody's trial, a special agent of the Strike Force provided Miron's grand jury testimony to the probation officer who prepared Cody's presentence report. The report used Miron's immunized testimony to establish a connection between Cody and Castellano.
 
 
 6
 Subsequently, the Brooklyn Strike Force initiated an investigation of potential racketeering violations by the Gambino organized crime family. On November 12, 1982, the government applied for authorization to place electronic bugs in Castellano's home. In support of the application, an affidavit by an FBI agent recited information substantiating probable cause for a wiretap concerning possible loansharking and murder. The affidavit also recited other criminal activities of the Gambino crime family. On the basis of that affidavit, Judge Bramwell signed an order authorizing a 30-day wiretap. Because of logistical difficulties in installing the necessary equipment, the Strike Force applied for and received three extensions of the original wiretap order. None of these applications referred to Miron's immunized testimony.
 
 
 7
 Information revealed in conversations intercepted at the Castellano residence led the government on April 8, 1983 to seek another extension of the original order and a broader wiretap authorization to cover Hobbs and Taft-Hartley Act violations. The affidavit supporting the application described the Gambino family's labor-racketeering activities, including providing "muscle" for and sharing payoffs with corrupt union officials, and stated that John Cody was one such official. In addition, the affidavit stated that reliable informants had told the FBI that Cody was a close associate of Carlo Gambino, former head of the organized crime family, and of Paul Castellano. Also included in the affidavit, however, was a reference to part of Miron's immunized 1980 grand jury testimony. Paragraph 18 stated:
 
 
 8
 I am also informed ... that during [the] investigation of the Cody case, he heard testimony from Julie Miron, the president of Miron Mason Supplies. Mr. Miron said that he had supplied materials for the construction for homes CASTELLANO's sons were building on Staten Island. A dispute arose over the price Mr. Miron was charging for the materials. Mr. Miron was then contacted by John Cody on behalf of CASTELLANO. Cody said that he thought Mr. Miron's prices for the CASTELLANO materials were too high. Cody then arranged a meeting with PAUL CASTELLANO, Cody, and Miron attended to discuss this dispute.
 
 
 9
 The agent who included this paragraph did not know that it was based on immunized grand jury testimony.
 
 
 10
 The affidavit went on to describe a number of intercepted conversations involving explicit and extensive labor-racketeering activities. It also stated that cars registered in Miron's name arrived at the Castellano residence and that Miron visited the home, after arranging a meeting with Castellano in a phone conversation during which Miron used a code name.
 
 
 11
 On April 8, 1983, Judge Bramwell extended and expanded the wiretap authorization as requested by the government. Conversations intercepted thereafter implicated Miron and his co-defendants in a large-scale labor payoff scheme involving the use of non-union labor on multi-million dollar contracts for work on Mobile Oil Corporation's deep water terminal and pipeline facility at Port Mobil, New York.
 
 
 12
 Based on this evidence, Miron was indicted on Taft-Hartley, racketeering and obstruction of justice charges in June 1986. Before trial, Miron moved to dismiss the indictment or, alternatively, to suppress the evidence on the ground that the government had improperly used his immunized grand jury testimony to obtain both the indictment and the evidence to be used against him at trial. Then Chief Judge Weinstein denied the motion, stating that the small part of Miron's immunized 1980 grand jury testimony referred to in the wiretap affidavit was "of no significance," and that its use was like "having a horse blanket and throwing it on top of ... a little handkerchief, no effect whatsoever." Judge Weinstein found that: (1) the FBI agent who prepared the affidavit in question did not know that Miron's testimony had been immunized; and (2) the government proved beyond a reasonable doubt the existence of "wholly independent legitimate sources" causing the government to apply for and the district court to grant the renewed and expanded wiretap order. He concluded that
 
 
 13
 It is apparent that (1) any judge of this court would have taken the same action, and that (2) the absence of the Miron references would have made no difference in the result. In terms of the order actually obtained, the immunized testimony of Miron had no impact at all.
 
 DISCUSSION
 
 14
 The parties agree that the evidence against Miron developed through the electronic surveillance authorization was the basis for his conviction. This appeal presents two issues: (1) whether the government's use of Miron's immunized testimony violated his fifth amendment and statutory rights; and (2) if so, whether he is entitled to relief for improper use of his immunized testimony where use of the testimony did not affect the course of events leading to his indictment.
 
 1. Unlawful Use of Immunized Testimony
 
 15
 I believe it clear that the portion of Miron's grand jury testimony used in the affidavit was subject to a valid claim of privilege. The precise question causing Miron to invoke the fifth amendment, and the government to enforce the immunity order, was, "Do you know John Cody?" No claim was made by the government that the privilege was improperly invoked, as an admission of a relationship with Cody might well have been a link in a chain of evidence showing criminality. See Hoffman v. United States, 341 U.S. 479, 486-87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Had Miron continued to refuse to testify concerning his relationship with Cody, which of course led to disclosure of his relationship with Castellano, Miron would have been held in contempt. That testimony is thus covered by use-immunity under 18 U.S.C. Sec. 6002 (1982).[1]
 
 
 16
 The government argues, however, that because the crimes committed by Miron occurred after he gave his immunized testimony, the use of that testimony in securing the indictment and his conviction violates neither the statute nor the fifth amendment. I do not discern in relevant Supreme Court decisions such a broad principle. Indeed, Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), held the registration provisions of the gambling tax statutes unconstitutional on the ground that "[p]rospective registrants can reasonably expect that registration ... will significantly enhance the likelihood of their prosecution for future acts, and that it will readily provide evidence which will facilitate their convictions." Id. at 54, 88 S.Ct. at 706. Marchetti rejected an inflexible "chronological formula" because it might open avenues for evasion of the privilege and adopted as the proper test "the substantiality of the risks of incrimination." Id. Because compliance with the registration provisions of the gambling tax statutes virtually always required the registrant to announce an intention to commence violations of various state and federal gambling statutes, the risk of incrimination was high indeed and the Court invalidated the provisions in question.
 
 
 17
 In a later case, United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the Court upheld the registration provisions of the National Firearms Acts that require the transferor to register the transfer prior to its execution by providing the fingerprints and photograph of the transferee. Once the registration is approved (transfers to persons with criminal records being prohibited), the transfer may take place. The Court rejected the argument that registration might incriminate the transferee for future crimes. Its rationale, however, was not that the fifth amendment makes strict chronological distinctions, but that the risk of incrimination as to future crimes was insubstantial because the government had assured the Court that registration data was not made available by the Internal Revenue Service to local, state or federal law enforcement agencies, except for the prosecution of unlawful failures to register. Because other agencies "never see the information," the Court reasoned, the transferee "is left in the same position as if he had not given it." Id. at 606, 91 S.Ct. at 1117.
 
 
 18
 I believe the facts in the instant case are governed by Marchetti rather than Freed. The grand jury here was gathering information about ongoing criminal activity involving labor racketeering, and the information it gathered was available to federal law enforcement officials. In a real sense, therefore, testimony by Miron regarding his business, which was closely related to the construction industry and involved union contracts, his relationship with Cody, who was the subject of the investigation, and his relationship with Castellano, who was a widely-reputed organized crime boss, disclosed "links in a chain of evidence," Marchetti, 390 U.S. at 48, 88 S.Ct. at 703, that were potentially incriminating both as to past and future crimes arising out of the activity being investigated. The very use of Miron's immunized testimony in the application for an extension and expansion of the surveillance authorization demonstrates the testimony's inculpatory nature. As in Marchetti, therefore, application of an inflexible chronological test in the present circumstances would open avenues of evasion, by allowing a grand jury investigating ongoing activity to immunize a person so as to obtain testimony that would thereafter support probable cause for electronic surveillance of that person. Moreover, because labor racketeering is, like gambling, generally an ongoing activity, a substantial risk of incrimination attends the questioning of persons in situations similar to Miron's. I thus conclude that the use of Miron's immunized testimony violated the use-immunity statute and the fifth amendment.
 
 2. Harmless Error
 
 19
 I conclude, however, that the violation of Miron's statutory and constitutional rights had no effect on the course of events leading to his indictment and conviction and therefore does not require dismissal of the indictment. The affidavit contained numerous facts directly establishing probable cause to extend the prior order concerning loan-sharking, extortion and murder, and to expand it to include labor racketeering. The evidence of conversations in Castellano's home relating to labor racketeering was quite explicit with regard to ends, means and the unions involved. The short paragraph derived from Miron's immunized testimony merely indicated that Miron knew Cody, then a convicted labor racketeer, and that Miron had met with Castellano to discuss innocent matters at Cody's suggestion. This was of negligible significance, however, in light of independent evidence that, after the grand jury testimony, Miron's cars were seen at Castellano's home and that Miron used a code name in a phone call to arrange a meeting with Castellano. The district court was thus entirely correct in concluding that "even without [the immunized] testimony, the government would have acted exactly as it did, and no judge of this court would have deviated in the slightest from the course of granting orders authorizing the bugs that revealed information incriminatory to Miron."
 
 
 20
 That finding being fully supported, I would affirm. The existence of a federal constitutional violation does not per se compel relief. Chapman v. California, 386 U.S. 18, 21-22, 87 S.Ct. 824, 826-27, 17 L.Ed.2d 705 (1967). "[S]ome constitutional errors ... are so unimportant and insignificant" and have so "little, if any, likelihood of having changed the result of the [proceeding]" that they "may ... be deemed harmless." Id. at 22, 87 S.Ct. at 827. With such errors, the court must be able to declare its belief that the error was harmless beyond a reasonable doubt, id. at 21-24, 87 S.Ct. at 826-28, as the district court did in this case.
 
 
 21
 In examining a particular error to determine whether it was harmless, we bear in mind that "while there are some errors to which Chapman does not apply, they are the exception and not the rule." Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). An example of a violation to which Chapman would not apply would be the denial of the assistance of counsel at trial. See Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). In such a case, of course, the error permeates the entire proceeding, and harmless error analysis would inevitably entail speculation. Where the effect of the error is more confined, however, we can be more confident of a judgment as to its effect on the proceeding as having been harmless beyond a reasonable doubt. See, e.g., Rushen v. Spain, 464 U.S. 114, 118, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983) (per curiam) (ex parte communications to judge); United States v. Hasting, 461 U.S. 499, 508-09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (improper comment on defendant's failure to testify); Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (admission of confession obtained in violation of right to counsel); Chambers v. Maroney, 399 U.S. 42, 52-53, 90 S.Ct. 1975, 1981-82, 26 L.Ed.2d 419 (1970) (admission of evidence obtained in violation of fourth amendment); Harrington v. California, 395 U.S. 250, 251-54, 89 S.Ct. 1726, 1727-28, 23 L.Ed.2d 284 (1969) (admission of non-testifying codefendant's statement).
 
 
 22
 The defect in the instant case does not fit within the "limited category of constitutional errors that are deemed prejudicial in every case." Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). This case requires us only to render a judgment concerning the significance of the paragraph of immunized material as to the finding of probable cause. I conclude that the use of immunized testimony in this case constituted harmless error beyond a reasonable doubt. See United States v. Nemes, 555 F.2d 51, 55-56 (2d Cir.1977) (use of immunized testimony in indictment subject to harmless error rule); United States v. Byrd, 765 F.2d 1524, 1530-31 (11th Cir.1985) (same); United States v. Gregory, 730 F.2d 692, 697-98 (11th Cir.1984), cert. denied, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); United States v. Shelton, 669 F.2d 446, 461-64 (7th Cir.), cert. denied, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). Here the record plainly indicates that, except for the single paragraph in question, the government's information came from reliable FBI informants other than appellant, and from direct surveillance, and that the paragraph in question was of negligible significance. See Kastigar v. United States, 406 U.S. 441, 460, 92 S.Ct. 1653, 1664-65, 32 L.Ed.2d 212 (1972) (evidence introduced by government must be derived from legitimate sources wholly independent of compelled testimony); United States v. Mariani, 851 F.2d 595 (2d Cir.1988) (same); United States v. Seiffert, 501 F.2d 974, 982 (5th Cir.1974); United States v. Kurzer, 534 F.2d 511, 516 (2d Cir.1976); United States v. Hampton, 775 F.2d 1479, 1485-86 (11th Cir.1985). With regard to labor racketeering, the subsequent extension and expansion of the order was not a borderline case. The affidavit recited a range of explicit information from confidential sources and intercepted conversations showing that the Gambino organized crime family was engaged in labor racketeering, and that conversations in furtherance of that racketeering were occurring in Castellano's home. Miron, who owned a building supply business, had arranged a meeting at Castellano's home under a code name, and his cars were seen there on other occasions.
 
 
 23
 In concluding that the inadvertant use of immunized testimony in this case was harmless, I find support in decisions concerning whether evidence is tainted as a result of inaccuracies subsequently found in an affidavit supporting an application for a warrant. Under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a reviewing court must examine the unchallenged portions of the affidavit and determine whether those portions are sufficient to support a probable cause finding. The analogy between fourth and fifth amendment cases is, of course, limited. As Kurzer stated,
 
 
 24
 The reason is that the principal function of the Fourth Amendment exclusionary rule is to deter unlawful police conduct, and it can be argued that it serves little deterrent purpose to exclude evidence which is only indirectly and by an attenuated chain of causation the product of improper police conduct. The Fifth Amendment, in contrast, is by its terms an exclusionary rule, and as implemented in the immunity statute it is a very broad one, prohibiting the use not only of evidence, but of "information," "directly or indirectly derived" from the immunized testimony. The statute requires not merely that evidence be excluded when such exclusion would deter wrongful police or prosecution conduct, but that the witness be left "in substantially the same position as if [he] had claimed the Fifth Amendment privilege."
 
 
 25
 534 F.2d at 516 (citations omitted). Kurzer says no more, however, than that when the defendant has been put at a disadvantage because of the use of his immunized testimony, although indirect and attenuated, then he deserves relief under Kastigar. In the instant case, the use of immunized testimony did not disadvantage Miron. Moreover, I can state with confidence not only that the unchallenged portions of the affidavit would support a finding of probable cause, but also that any judge would have made such a finding.
 
 
 26
 My analysis is bolstered by the recent decision in Murray v. United States, --- U.S. ----, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), a fourth amendment case ruling that the "independent source" doctrine permits the admission of evidence initially discovered during an unlawful search but later obtained independently from lawful activities. The Court noted that the situation would be different if the government's decision to seek the warrant or the judge's decision to issue the warrant had been affected by what was observed during the illegal initial search. The Murray holding clearly is apposite to the instant case, where neither the government's decision to seek the expanded wiretap order nor the judge's decision to grant it was affected by the use of the small portion of immunized testimony.
 
 
 27
 In addition, the contract analogy urged by appellant supports, rather than undermines, my conclusion. Appellant argues that immunity is based on a bargained exchange between the government and the witness--in return for his partial surrender of his right to remain silent, the witness is promised that the information he provides will not be used against him. Appellant asks us to rule that any breach of this agreement, however immaterial, requires that the judgment of conviction be vacated. I cannot agree. Such a rule would vitiate the function of the harmless error rule. While it is of utmost importance that the government respect and scrupulously observe restrictions on the use of immunized testimony, I see no reason to set aside an otherwise valid conviction because of an error that had no effect on the course of events. Application of a contract analogy to these facts does not lead us to a different result. A partial breach with no harm or damage to the complaining party cannot be a basis for a contract action. See Calabria v. Associated Hospital Serv., 459 F.Supp. 946, 949 (S.D.N.Y.1978) (without allegation of facts showing damages, action for breach of contract cannot be maintained), aff'd sub nom. Spoto v. Associated Hospital Serv., 610 F.2d 807 (2d Cir.1979).
 
 
 28
 In view of Judge Van Graafeiland's separate concurring opinion, the judgment is affirmed.
 
 VAN GRAAFEILAND, Circuit Judge, concurring:
 
 29
 I agree fully with Judge Winter's holding that, regardless of whether the reference to Miron's grand jury testimony in the wiretap application violated his rights, the violation was harmless error, and I concur in the affirmance of the judgment of conviction. Without derogating in any way the strength of this concurrence, I also would affirm on the alternative grounds advanced by the district court. Hence, this concurring opinion.
 
 FACTUAL BACKGROUND
 
 30
 Local 282 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America represents a group of truck drivers who operate in and around New York City. John Cody became president of the Local in 1976. Local 282 sponsors several employee benefit plans, and, from 1965 until 1983, John Cody was a trustee of the funds created under these plans. John Cody was both a bad president and a bad trustee.
 
 
 31
 Mismanagement of the plans' funds led to extensive civil litigation which resulted eventually in Cody's removal from his positions as trustee. See Marshall v. Teamsters Local 282 Pension Trust Fund, 458 F.Supp. 986 (E.D.N.Y.1978); Katsaros v. Cody, 568 F.Supp. 360 (E.D.N.Y.1983), aff'd in pertinent part, 744 F.2d 270 (2d Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). Misuse of Cody's offices also led to a 1980 federal grand jury investigation. The jury was interested primarily in ascertaining whether Cody was using his official status to compel the making of illegal payments or kickbacks. See 29 U.S.C. Sec. 186(b). Cody was indicted and convicted on several counts which alleged the receipt of unlawful payments and on several related counts of tax evasion and fraud. See United States v. Cody, 722 F.2d 1052 (2d Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984).
 
 
 32
 In 1980, appellant Miron, who was president of a number of building supply companies that hired Local 282 truck drivers, was called as a witness before the grand jury investigating Cody. Apparently the United States Attorneys Office had learned that Cody had intervened in a dispute between Miron and two of Paul Castellano's sons over prices charged by Miron for building supplies furnished to the sons. Miron was questioned concerning this incident. That portion of his testimony, which is the testimony at issue herein, is set forth in an appendix to this opinion labeled Exhibit A. The obvious purpose of the quoted testimony was to show a relationship between Cody and Castellano, upon whose behalf Cody intervened. It was not directed in any way at Miron, who testified under a grant of general immunity.
 
 
 33
 Two years after the testimony was given, the Organized Crime Strike Force commenced an investigation into suspected criminal activities of the so-called Gambino "family". On November 12, 1982, the Strike Force applied to Judge Bramwell for an order authorizing the placement of an electronic surveillance device in the residence of Paul Castellano, a reputed member of the "family". In support of this application, the Strike Force submitted a 59-page affidavit asserting probable cause to believe that discussions about loansharking, extortion and conspiracy to commit murder took place at the Castellano residence.
 
 
 34
 Judge Bramwell authorized electronic surveillance for a 30-day period. This authorization had to be renewed three times before the FBI succeeded in entering the Castellano home and installing the surveillance device. During the first week of electronic surveillance, conversations were overheard which broadened the area of suspected illegal family activities to include labor racketeering. Accordingly, the Strike Force applied for another extension of the interception order and an expansion of the order to cover discussions involving labor matters. In support of this application, the Strike Force submitted the affidavit which gives rise to this appeal. The affidavit described the structure of the Gambino family's suspected labor racketeering operation and asserted the existence of a close association between the recently convicted Cody and Castellano. The affidavit stated in part:
 
 
 35
 Since Cody assumed power with Local 282, he has been known by the Federal Bureau of Investigation and other law enforcement agencies as a close associate of several high-ranking organized crime figures. Informant information which has been corroborated by physical surveillance and Cody's own admissions to FBI agents established a close relationship between Cody and both Carlo Gambino and Ettore Zappi.
 
 
 36
 After Gambino's death, Cody became associated with PAUL CASTELLANO, who succeeded Gambino as head of that organized crime family.
 
 
 37
 Without realizing that he was referring to immunized grand jury testimony, the FBI deponent followed the above-quoted paragraphs with the following one:
 
 
 38
 I am also informed by Special Attorney Michael Guadagno of the Organized Crime Strike Force in the EDNY that during his investigation of the Cody case, he heard testimony from Julie Miron, the President of Miron Mason Supplies. Mr. Miron said that he had supplied materials for the construction for homes CASTELLANO's sons were building on Staten Island. A dispute arose over the price Mr. Miron was charging for the materials. Mr. Miron was then contacted by John Cody on behalf of CASTELLANO. Cody said that he thought Mr. Miron's prices for the CASTELLANO materials were too high. Cody then arranged a meeting which PAUL CASTELLANO, Cody, and Miron attended to discuss this dispute.
 
 
 39
 Once again, the obvious purpose of the quoted paragraph was to show the existence of a relationship between Cody and Castellano. Insofar as Miron was concerned, the paragraph was completely innocuous.
 
 
 40
 On the basis of the above-described affidavit, Judge Bramwell authorized an additional 30-day extension of the interception order and an expansion of its scope to cover labor matters. Conversations thereafter intercepted implicated Miron and some of his codefendants in a 1981-82 labor racketeering scheme involving Mobil Oil Corporation's deep water terminal and pipeline facility at Port Mobil, New York. This evidence, as well as evidence obtained through physical surveillance of the Castellano residence, led to Miron's indictment in 1986 on charges of racketeering, obstruction of justice, and violation of the Taft-Hartley Act.
 
 
 41
 Prior to trial, Miron moved unsuccessfully to dismiss the indictment against him or, alternatively, to suppress the evidence which was to be used against him, on the ground that the Government had made improper use of his grand jury testimony. Judge Weinstein denied that motion and also a post-trial motion for similar relief. In support of the latter, he wrote a scholarly and well-reasoned memorandum opinion in which he made the following factual findings:
 
 
 42
 (1) The FBI agent whose affidavit is challenged did not know that Miron's testimony, which the agent summarized, was given under a grant of immunity before a grand jury.
 
 
 43
 (2) The Assistant United States Attorney who told the FBI agent about Miron's testimony did not know what use the agent intended to make of it.
 
 
 44
 (3) The Government proved beyond a reasonable doubt the existence of "wholly independent legitimate sources" for both the petition and the granting of the extended bugging order.
 
 
 45
 (4) The reference to Miron's testimony in the application for the extension order was "of absolutely no significance" and Judge Bramwell would have granted the order "without that testimony."
 
 
 46
 (5) Miron's grand jury testimony, given in June 1980, related to events that occurred in the 1970's, while the crimes and predicate acts for which he was convicted took place between December 1981 and June 1983.
 
 
 47
 (6) It would have been impossible at the time of his grand jury testimony for Miron even to have contemplated the particular crimes of which he was convicted.
 
 DISCUSSION
 
 48
 In my opinion, this case squarely presents the issue whether Justice Powell's broad language in Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), was intended to mean that a grant of immunity under section 6002 will provide derivative use immunity for crimes not yet committed or even contemplated when the grant was made. My colleagues seek to avoid confronting this issue by making factual findings that directly contradict those of the district court summarized in the above paragraphs numbered (5) and (6). At the very outset of his opinion, Judge Weinstein expressed its theme to be "Immunization does not provide a warrant to commit new crimes." Thereafter, under the heading "Subsequent Crime Immunity", Judge Weinstein wrote:
 
 
 49
 The government contends that we need not decide whether it has met its burden of proving wholly independent legitimate sources, because Miron could not in the first place have asserted the privilege in order to protect himself against prosecution for crimes committed subsequent to the compelled testimony. The defendant opposes any application of a subsequent act doctrine limiting his immunity.
 
 
 50
 As already noted, Miron's testimony was compelled in June 1980. It related to events which took place in the 1970's. The particular conspiracy crimes and predicate acts for which he was convicted took place between December 1981 and June 1983.
 
 
 51
 Judge Weinstein then proceeded for twelve pages to develop and support his contention that Miron's grand jury testimony, given on June 18, 1980, did not immunize him against its use in connection with "noncontinuing new prospective" crimes committed several years later. Whether or not we agree with Judge Weinstein's legal conclusions, we cannot disregard his findings of fact. Pullman-Standard v. Swint, 456 U.S. 273, 287-90, 102 S.Ct. 1781, 1789-91, 72 L.Ed.2d 66 (1982). Moreover, in moving from Judge Weinstein's findings to his conclusions of law, we should distinguish between the immunity created by the Constitution and the immunity created by statute. They are not necessarily the same. Kastigar v. United States, supra, 406 U.S. at 453, 92 S.Ct. at 1661; Adams v. Maryland, 347 U.S. 179, 181, 74 S.Ct. 442, 444, 98 L.Ed. 608 (1954); Smith v. United States, 337 U.S. 137, 147, 69 S.Ct. 1000, 1005, 93 L.Ed. 1264 (1949).
 
 
 52
 The traditional, long-settled constitutional rule was that the privilege against self-incrimination "has relation only to past acts, not to future acts that may or may not be committed." United States v. Kahriger, 345 U.S. 22, 32, 73 S.Ct. 510, 515, 97 L.Ed. 754 (1953). "The object of the Amendment 'was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony that might tend to show that he himself had committed a crime.' " Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) (quoting Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892)). "We fail to see how any answer could tend to incriminate when the crime presently involved was not committed or perhaps even contemplated when the answer was given." United States v. Smith, 206 F.2d 905, 908 (3d Cir.1953); see United States v. American Radiator & Standard Sanitary Corp., 278 F.Supp. 608, 612 (W.D.Pa.1967).
 
 
 53
 Some minor exceptions to the traditional rule were created, largely as a result of federal licensing and taxing statutes which covered activities made unlawful under state law. Because of the incriminatory nature of the disclosures required by some of the federal laws, the Supreme Court abandoned the "rigid chronological distinction" between past and future criminal acts. Marchetti v. United States, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968). The correct test, the Court said, should be whether the defendant was "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." Id. The Marchetti Court recognized, however, that "prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination." Id. at 54, 88 S.Ct. at 705; see United States v. Apfelbaum, 445 U.S. 115, 129-30, 100 S.Ct. 948, 956-57, 63 L.Ed.2d 250 (1980); United States v. Freed, 401 U.S. 601, 606-07, 91 S.Ct. 1112, 1116-17, 28 L.Ed.2d 356 (1971); DeSimone v. United States, 423 F.2d 576, 581 (2d Cir.), cert. denied, 400 U.S. 842, 91 S.Ct. 84, 27 L.Ed.2d 77 (1970). Licensing and taxing statutes aside, the only hazards of incrimination that are likely to be considered substantial and real are those which relate to existing or past misdeeds or a continuing course of criminal activity. United States v. Quatermain, Drax, 613 F.2d 38, 42-43 (3d Cir.), cert. denied, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). That is not the situation with which we are confronted in the instant case.
 
 
 54
 The immunity order at issue was a general order requiring Miron to testify "as to all matters about which he may be interrogated before said grand jury." My reading of the record satisfies me that the order was granted on March 12, 1980, and Miron did not testify until June 18, 1980. A pre-hearing general grant of immunity such as this is permitted under 18 U.S.C. Sec. 6003. United States v. Pacella, 622 F.2d 640, 643-44 (2d Cir.1980); Matter of the Application of the United States Senate Permanent Subcommittee on Investigations, 655 F.2d 1232, 1236-37 & n. 22 (D.C.Cir.), cert. denied, 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981); United States v. Leyva, 513 F.2d 774, 775-76 (5th Cir.1975). Obviously, not "all matters about which [Miron was] interrogated" would have created substantial and real hazards of incrimination; e.g., "What is your date of birth?", "How are you employed?". "[Fifth Amendment] protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); United States v. Seewald, 450 F.2d 1159, 1163 (2d Cir.1971), cert. denied, 405 U.S. 978, 92 S.Ct. 1206, 31 L.Ed.2d 253 (1972). "[I]f the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness, the [Fifth Amendment] ceases to apply." Brown v. Walker, 161 U.S. 591, 597, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896).
 
 
 55
 A fair reading of the testimony set forth in the appendix, Exhibit A, reveals no more than that Miron met Castellano in connection with an innocuous and lawful transaction, one that in no way incriminated Miron. See O'Connell v. United States, 40 F.2d 201, 204 (2d Cir.), cert. dismissed, 296 U.S. 667, 51 S.Ct. 658, 75 L.Ed. 1472 (1930); United States v. Seavers, 472 F.2d 607, 611 (6th Cir.1973). As the district court found, it would have been impossible at the time Miron gave this testimony for him even to have contemplated the particular crimes of which he was convicted.
 
 
 56
 However, if the Supreme Court's holding in Kastigar v. United States, supra, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 is as broad as Justice Powell's opinion would seem to indicate, even such an innocent question as "What is your name?", would forever entitle the witness to Fifth Amendment immunity for his answer. Indeed, no matter how innocuous a question may appear to be, if immunity is claimed, it would be the rare prosecutor, Attorney General, or judge who could guarantee that, twenty-five or thirty years later, the answer to the question would not be used derivately to connect the witness to some unlawful event. If the Constitution henceforth is to be construed in this manner, even a witness who has led an impeccable life would be well-advised not to testify before a grand jury without a grant of complete immunity. A prosecutor also would be foolish to secure a general grant of immunity for a prospective witness, as Congress specifically has authorized him to do. The prosecutor might find that he unwittingly has given the prospective witness an "immunity bath", see H.R.Rep. No. 1549, 91st Cong., 2d Sess. 42, reprinted in 1970 U.S.Code Cong. & Admin.News 4007, 4017, or "insulation for a career of crime about to be launched." United States v. Freed, supra, 401 U.S. at 607, 91 S.Ct. at 1117.
 
 
 57
 Kastigar views the issue of immunity from the retrospective viewpoint of what follows from a grant of immunity; it does not address the prospective issue whether immunity should be granted in the first place. When a Fifth Amendment privilege is asserted, the prosecutor must make a prompt decision whether to seek a grant of immunity. He then must secure permission from the Attorney General before applying for a court order. "The purpose of Sec. 6002 [sic] was to ... limit the use of immunity to those cases in which the Attorney General, or officials designated by him, determine that gaining the witness' testimony outweighs the loss of the opportunity for criminal prosecution of that witness." Pillsbury Co. v. Conboy, 459 U.S. 248, 260-61, 103 S.Ct. 608, 615-16, 74 L.Ed.2d 430 (1983). The prosecutor and the Attorney General must balance "the Government's interest in obtaining information against the risk that immunity will frustrate the Government's attempts to prosecute the subject of the investigation," United States v. Doe, 465 U.S. 605, 616, 104 S.Ct. 1237, 1244, 79 L.Ed.2d 552 (1984), and should confer immunity only if there is a "realistic possibility that [the witness'] answer to a question can be used in any way to convict him of a crime." Pillsbury, supra, 459 U.S. at 266 n. 1, 103 S.Ct. at 618 n. 1 (Marshall, J., concurring). The prosecutor and Attorney General can make this balance effectively only if they are familiar with the facts on both sides of the balancing scale.
 
 
 58
 A federal prosecutor does not offer immunity to a suspected criminal unless he expects to obtain important testimony that would not otherwise be available. The prosecutor realizes that, in almost all cases, an offer of immunity--even of use immunity--means sacrificing the chance to prosecute the witness for his own role in the criminal enterprise.
 
 
 59
 Pillsbury Co. v. Conboy, supra, 459 U.S. at 288, 103 S.Ct. at 630 (Stevens, J., dissenting). If immunity is granted, it should be "as broad as, but not harmfully and wastefully broader than, the privilege against self-incrimination." Murphy v. Waterfront Commission, 378 U.S. 52, 107, 84 S.Ct. 1594, 1618, 12 L.Ed.2d 678 (1964) (White, J., concurring).
 
 
 60
 Insofar as the Fifth Amendment is concerned, the consensus seems to be that, in the ordinary run of criminal cases, the only hazards of incrimination that are real and substantial are those which relate to past misdeeds or a continuing course of criminal activity. See Lefkowitz v. Turley, supra, 414 U.S. at 77, 94 S.Ct. at 322; Marchetti v. United States, supra, 390 U.S. at 54, 88 S.Ct. at 705; United States v. Brimberry, 779 F.2d 1339, 1346 (8th Cir.1985); United States v. Black, 776 F.2d 1321, 1326-27 (6th Cir.1985); United States v. Quatermain, Drax, supra, 613 F.2d at 42; United States v. Phipps, 600 F.Supp. 830, 831-32 (D.Md.1985); United States v. Caron, 551 F.Supp. 662, 671 (E.D.Va.1982), aff'd without opinion, 722 F.2d 739 (4th Cir.1983), cert. denied, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984).
 
 
 61
 I agree with the district court that Miron's testimony that he met Castellano on one occasion in connection with a legitimate business transaction between Miron and Castellano's sons could not have been said at the time to create a "real possibility" that it could be used to convict Miron of an uncontemplated, noncontinuing and new prospective crime occurring two years later. However, since the testimony was given under a grant of immunity, it is entitled to Fifth Amendment protection. Maness v. Meyers, 419 U.S. 449, 474-75, 95 S.Ct. 584, 599, 42 L.Ed.2d 574 (1975) (White, J., concurring). We therefore must decide how all-encompassing and enduring the immunity must be. I do not believe Congress intended that, in a case such as this, the grant should protect against the derivative use of the immunized testimony in connection with any crime, no matter how remote in time and place and unpredictable in nature it might be. See Pillsbury Co. v. Conboy, supra, 459 U.S. at 288-89 & nn. 8 & 9, 103 S.Ct. at 629-30 & nn. 8 & 9 (Stevens, J., dissenting).
 
 
 62
 Immunity aside, if there is a violation of a grand jury witness' Fifth Amendment rights, that violation occurs at the time the witness testifies. 8 Wigmore on Evidence Sec. 2263 at 362-63 (3d ed. 1974). It is at that time that the witness either claims or waives his Fifth Amendment privilege. Minnesota v. Murphy, 465 U.S. 420, 428-29, 104 S.Ct. 1136, 1142-43, 79 L.Ed.2d 409 (1984); Garner v. United States, 424 U.S. 648, 653-56, 96 S.Ct. 1178, 1181-83, 47 L.Ed.2d 370 (1976). The derivative use of testimony in connection with an unforeseen crime occurring years after a grand jury rises cannot illegitimize testimony that was lawfully secured. I see no reason why a different result should follow a grant of immunity based on a supportable claim of privilege. In short, I agree with Judge Weinstein that "the language in Kastigar ... prohibiting the use of compelled testimony 'in any respect' is not to be taken literally."
 
 
 63
 If Kastigar is a correct interpretation of the congressional intent exhibited in section 6002, I suggest that Congress has gone beyond the requirements of the Fifth Amendment. See Adams v. Maryland, supra, 347 U.S. at 181, 74 S.Ct. at 445. "The establishment ... of constitutional rights cannot be accomplished either by congressional action or executive fiat." Clark v. Board of Educ., 374 F.2d 569, 570 (8th Cir.1967); see also Counselman v. Hitchcock, 142 U.S. 547, 585, 12 S.Ct. 195, 206, 35 L.Ed. 1110 (1892). This possibility should not be overlooked when considering the question of harmless error.
 
 
 64
 I find no merit in Miron's contention that he had a contract with the Government which precluded the Government from making any use at any time of the testimony quoted in the appendix. My reading of the record satisfies me that the order of general immunity was granted three months before Miron testified. He had no choice whether to accept it; he was required to testify. This is not the stuff of which contracts are made. This case clearly is distinguishable from those in which promises of immunity or lighter sentence are made in exchange for agreements to plead or cooperate. E.g., Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). In those cases, the typical contractual requirements of offer and acceptance are present. Here, we have neither.
 
 
 65
 The district court concluded its reasons for rejecting Miron's motions by elaborating on its factual findings that there were wholly independent, legitimate bases for the granting of Judge Bramwell's 30-day extension order and that Judge Bramwell would have granted the order even though the challenged reference to Miron's grand jury testimony was not included in the application. Like my colleague Judge Winter, I find the district court's reasoning to be most persuasive.
 
 
 66
 An examination of the legislative history of sections 6002 and 6003 indicates that Congress did not intend that a violation of those sections would result in a per se constitutional injury requiring dismissal of the indictment. Congressman Richard Poff, Vice-Chairman of the National Commission for Reform of the Federal Criminal Laws and co-author of the proposed legislation, described the statutory provisions as a "use restriction similar to the exclusionary rule." Hearings on H.R. 11157 and H.R. 12041 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 91st Cong., 1st Sess. at 30 (1969). Will Wilson, Assistant Attorney General, Criminal Division, Department of Justice, testified that "under the proposal the possibility of criminal prosecution based upon independent evidence remains open." Id. at 40. Citing United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966) as authority, Professor Robert G. Dixon of the National Law Center of George Washington University, and Consultant to the National Commission for Reform of the Federal Criminal Laws, testified that the remedy for violation of the proposed law would be suppression of tainted evidence, not dismissal of the indictment. Id. at 57, 63-64.
 
 
 67
 This is the type of case that permits application of the harmless error rule. See United States v. Hasting, 461 U.S. 499, 507-12, 103 S.Ct. 1974, 1979-82, 76 L.Ed.2d 96 (1983); United States v. Gregory, 730 F.2d 692, 698 (11th Cir.1984), cert. denied, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); United States v. Beery, 678 F.2d 856, 863 (10th Cir.1982); United States v. Shelton, 669 F.2d 446, 464 & n. 32 (7th Cir.), cert. denied, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). If, in fact, we are dealing with only the violation of a statute, not of the Fifth Amendment, the harmless error rule is particularly applicable. United States v. Shelton, supra, 669 F.2d at 464 n. 32.
 
 
 68
 The district court found that the use of Miron's testimony had "no effect at all on events"; that, instead, it was like "a leaf dropping unobserved in a deep forest" and Miron was "left in precisely the same position as if he had never testified." This finding of no taint was not clearly erroneous and should be accepted by this Court. See United States v. Lipkis, 770 F.2d 1447, 1450 (9th Cir.1985); United States v. Rogers, 722 F.2d 557, 560 (9th Cir.1983), cert. denied, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984); United States v. Provenzano, 620 F.2d 985, 1005 (3d Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); United States v. Romano, 583 F.2d 1, 7 (1st Cir.1978); United States v. Jones, 542 F.2d 186, 199 (4th Cir.), cert. denied, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). I agree with the district court that the 30-day extension order would have been granted in any event and the evidence uncovered thereby would have been presented to the jury exactly as it was.
 
 
 69
 As stated at the outset, I also agree with Judge Winter that the judgment of the district court should be affirmed.
 
 EXHIBIT A
 
 70
 Q Do you know a man by the name of Paul Castellano?
 
 
 71
 * * *
 
 
 72
 * * *
 
 
 73
 A Yes, I do.
 
 
 74
 Q When did you meet Castellano?
 
 
 75
 A About a year or two ago.
 
 
 76
 Q Who introduced you to him?
 
 
 77
 A John Cody.
 
 
 78
 Q And what were the circumstances of that introduction?
 
 
 79
 A His sons were building homes.
 
 
 80
 Q Whose sons?
 
 
 81
 A Mr. Castellano's sons were building homes in Staten Island that we were supplying. He wanted to meet me to see if I was giving him the right prices for the materials delivered and that was the extent of the conversation.
 
 
 82
 Q Where did the meeting take place?
 
 
 83
 A One of the restaurants in New York.
 
 
 84
 Q What restaurant?
 
 
 85
 A I don't remember. I really don't remember what restaurant it was.
 
 
 86
 Q Who was present at the meeting?
 
 
 87
 A Mr. Castellano, myself and John Cody.
 
 
 88
 Q And was this a luncheon meeting?
 
 
 89
 A I don't know whether it was a luncheon. I really don't remember.
 
 
 90
 Q How long did it take?
 
 
 91
 A Maybe an hour, an hour and a half.
 
 
 92
 * * *
 
 
 93
 * * *
 
 
 94
 Q You said you supplied two of his sons; is that correct?
 
 
 95
 A Yes.
 
 
 96
 Q What were their names?
 
 
 97
 A Joe Castellano and Paul Castellano.
 
 
 98
 Q Both of them built homes on Staten Island, also?
 
 
 99
 A Uh huh.
 
 
 100
 Q What services did you or your companies provide to them?
 
 
 101
 A I sold them all building materials, lumber and brick, lumber, Portland Cement, such as that, whatever we handle.
 
 
 102
 Q Was there any--withdrawn.
 
 
 103
 After Mr. Cody introduced you to Mr. Castellano and you had this initial meeting with him, as you say, to find out whether or not you were giving his son the correct prices, was that it?
 
 
 104
 A That's what he wanted to be sure of, that I wasn't overcharging.
 
 
 105
 Q Had there been an accusation that you were overcharging him.
 
 
 106
 A He felt that my prices were high.
 
 
 107
 Q And as a result of that meeting, did you change any of your prices?
 
 
 108
 A No, sir.
 
 
 109
 Q Did this meeting come before or after you had started to supply one or both of his sons?
 
 
 110
 A The meeting came after supplying the sons.
 
 
 111
 Q After supplying both of them?A Yes.
 
 
 112
 Q So there was an outstanding bill for both sons; is that correct?
 
 
 113
 A Well, the sons, their bills were okay. They were paid.
 
 
 114
 Q They were paid?
 
 
 115
 A They were paying regularly.
 
 
 116
 Q They were paying?
 
 
 117
 A Yes.
 
 
 118
 Q And what was Mr. Castellano's specific complaint, that the bills were too high?
 
 
 119
 A No. He thought that the prices were high at that time.
 
 
 120
 Q The prices for the lumber?
 
 
 121
 A Yes.
 
 
 122
 Q And what did you say to him?
 
 
 123
 A I told him it was the best prices I could sell them at for the quality and the species I supplied.
 
 
 124
 Q What was the area of the total bill for both sons?
 
 
 125
 A I would have to get that. I have got thousands of accounts. I do not monitor them myself. I am not a bookkeeper.
 
 
 126
 Q Was anything else discussed at this meeting other than the specific discussion about your prices for the sons' materials?
 
 
 127
 A Right, that's all.
 
 
 128
 Q Was anything else discussed at all?
 
 
 129
 A That's all.
 
 
 130
 Q Absolutely nothing else?
 
 
 131
 A Absolutely nothing.
 
 ALTIMARI, Circuit Judge, dissenting:
 
 132
 Today the court sanctions under the harmless error rule the government's use of evidence derived from a defendant's prior immunized grand jury testimony. Because such use of tainted evidence in a criminal prosecution of a defendant violates the federal immunity statute, 18 U.S.C. Secs. 6002-03, and the self-incrimination clause of the fifth amendment, I respectfully dissent.
 
 BACKGROUND
 
 133
 As the majority relates, in 1980, defendant Miron, head of a number of building supply companies in the New York metropolitan area, was compelled to testify as a witness before a grand jury investigating former labor official John Cody and his ties to organized crime. In exchange for his compelled testimony, Miron was given a general grant of immunity pursuant to 18 U.S.C. Sec. 6003. Miron testified before the grand jury about his relationship with Cody and Cody's relationship with Paul Castellano, who was then the reputed leader of the Gambino organized crime family. Although Miron did not testify against Cody at the 1982 trial which resulted in Cody's conviction for labor racketeering, Miron's prior grand jury testimony that Cody and Castellano were in contact concerning the prices to be charged for various building materials did corroborate other information provided by FBI informants as to the Cody-Castellano relationship.
 
 
 134
 By 1983, the Brooklyn Strike Force's investigation into the activities of Castellano had led them to Castellano's home on Staten Island. The government previously had obtained a series of wiretap orders authorizing the interception of conversations relating to violations of the RICO conspiracy statute--specifically regarding predicate acts of loansharking, extortion and murder. When the FBI was finally able to gain access to the Castellano residence to install an eavesdropping device, the intercepted conversations revealed that Castellano and his cohorts also were involved in labor racketeering.
 
 
 135
 The government promptly applied to Judge Bramwell for an extension and expansion of the wiretap order to include labor racketeering. The FBI deponent noted in his affidavit that he had learned as early as 1982 that the Gambino family was "engaged in labor racketeering and the corrupt control of labor unions." 671 F.Supp. 124, 126 (E.D.N.Y.1987). He explained that the Gambino family's participation in labor racketeering took the form of "supply[ing] 'muscle' ... for corrupt union officials [who] in turn extort money ... from construction company contractors ... for labor peace." Id. To establish the connection between Castellano, labor officials and construction company contractors, the FBI agent cited two reliable informants who revealed that Cody was closely associated with Castellano in the activities for which the former was convicted in 1982, and directly referred to Miron's immunized grand jury testimony indicating that Castellano, Cody and Miron met to work out prices for building materials. Id. at 126-27. As further evidence to support the government's assertion that there was probable cause to believe labor racketeering discussions were being held at the Castellano residence, the FBI deponent reported the results of physical surveillance and previously authorized electronic surveillance of the Castellano residence. Physical surveillance revealed repeated observations of automobiles registered to Local 282 officials and, on two occasions (March 24, 1983 and April 2, 1983), of an automobile registered to defendant Miron. Electronic surveillance revealed, among other things, that Miron had called Castellano to make an appointment to see him on March 24, 1983. Id. at 128.
 
 
 136
 On April 8, 1983, based upon the FBI agent's affidavit, Judge Bramwell authorized a wiretap to cover labor racketeering. The April 8, 1983 wiretap order led to the interception of conversations at the Castellano residence implicating defendant, Castellano and others in an illegal labor payoff scheme. The 1981-83 scheme involved payments to Castellano and Miron by a company which was awarded a multi-million dollar contract to restore Mobil Oil Corporation's deep water terminal and pipeline facility at Port Mobil, New York. The payments were made to get a pipeline welders' union to look the other way while the company hired outside non-union workers at lower wages. The intercepted conversations authorized pursuant to the April 8, 1983 order--characterized by the district court as "devastatingly incriminatory"--resulted in defendant's subsequent indictment, prosecution and conviction for labor racketeering. Id. at 129.
 
 DISCUSSION
 
 137
 The majority concedes that the government used defendant's immunized grand jury testimony in violation of the fifth amendment to obtain the wiretap authorization that provided the evidence to convict him of labor racketeering. Nevertheless, the majority concludes that because there were " 'wholly independent legitimate sources' " for the granting of the April 8, 1983 extension order, ante at 1081 (quoting 671 F.Supp. at 136), and because the government's use of Miron's immunized testimony was " 'of no ... significance,' " id. at 1080 (quoting 671 F.Supp. at 137), the violation of Miron's statutory and constitutional rights does not require dismissal of the indictment. I disagree.
 
 
 138
 The federal immunity statute provides that "no testimony or other information compelled ... (or any information directly or indirectly derived from such testimony or other information) may be used against the [defendant] in any criminal case." 18 U.S.C. Sec. 6002 (emphasis added). The government must show that all the evidence that it uses against a defendant is "derived from ... legitimate source[s] wholly independent of the compelled testimony." Kastigar v. United States, 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972) (emphasis added); see In re Sealed Case, 791 F.2d 179, 181-82 (D.C.Cir.) (Scalia, J.) (all evidence government seeks to introduce against immunized defendant must be "untainted"), cert. denied, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986).
 
 
 139
 At both the pre- and post-trial hearings concerning defendant's motion to dismiss the indictment, the district court recognized that it was "clearly a violation of the immunity granted to use" Miron's prior grand jury testimony and that the government "shouldn't have done it." In the court's judgment, however, "such use was not in and of itself dispositive," 671 F.Supp. at 137, unless the effect of that use was to create a "substantial" and "real" risk of incrimination. Since the district court found that Judge Bramwell would have granted the April 8, 1983 extension order even without the benefit of Miron's testimony, the improper use of that testimony by the government was, according to the court, of "no constitutional significance if it had no effect at all on events." 671 F.Supp. at 137.
 
 
 140
 Judge Weinstein believed, and the majority apparently accepts, that a "de minimis" use of compelled testimony does not "taint" what is derived therefrom. I am unwilling to accept the proposition that a "de minimis" violation of the fifth amendment is "inconsequential." Ante at 1082.
 
 
 141
 In 1980, Miron was given general "use" immunity to testify before a grand jury investigating organized crime's control over labor unions in the construction industry about his ties to Cody and Castellano. Seven years later, Miron was convicted, inter alia, of a RICO conspiracy involving his participation as an "associate" in the Gambino family enterprise and the conduct of that enterprise through a pattern of criminal activity consisting of labor racketeering. See 18 U.S.C. Sec. 1962(d). I fully agree with Judge Winter, Part 1. ante, that Miron's post-immunization activities were part of a "continuing course of ... criminal activity." United States v. Quatermain, 613 F.2d 38, 42 (3d Cir.), cert. denied, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980).[1] Consequently, once Miron was given blanket immunity under 18 U.S.C. Sec. 6003 for his testimony concerning activities relating to a continuing course of criminal conduct, I believe the protections afforded by the self-incrimination clause of the fifth amendment required the government to demonstrate that all the evidence it offered against Miron at trial was "derived from legitimate independent sources." See Kastigar, 406 U.S. at 461-62, 92 S.Ct. at 1665-66 (immunity statute is "coextensive with the privilege" against self-incrimination); accord Pillsbury Co. v. Conboy, 459 U.S. 248, 254-55, 103 S.Ct. 608, 612-13, 74 L.Ed.2d 430 (1983); United States v. Apfelbaum, 445 U.S. 115, 122-23, 100 S.Ct. 948, 952-53, 63 L.Ed.2d 250 (1980); see also H.R.Rep. No. 1549, 91st Cong., 2d Sess. 42, reprinted in 1970 U.S. Code Cong. & Admin.News 4007, 4017. This the government could not do since practically all the evidence offered against defendant was derived from the FBI agent's affidavit including the reference to Miron's immunized testimony.
 
 
 142
 The government's unlawful use of defendant's grand jury testimony cannot be saved by the majority's invocation of the harmless error rule. Neither the Supreme Court nor this court, until now, has ever held that the harmless error rule applies when, as in this case, there is a violation of the privilege against self-incrimination. Cf. United States v. Mariani, 851 F.2d 595, 600-01 (2d Cir.1988) (upholding conviction based upon evidence derived from sources independent of immunized testimony and where there was no direct or indirect use made of that testimony); United States v. Nemes, 555 F.2d 51, 54 n. 3 (2d Cir.1977) ("[i]f the indictment had been obtained by direct or derivative use of immunized testimony, it would have been subject to dismissal"); United States v. Kurzer, 534 F.2d 511, 515 (2d Cir.1976) (dismissal of indictment was not required because it was "uncontested that none of the testimony or information given by [defendant] while immunized was itself used in obtaining his indictment"). The majority's reliance on the Supreme Court's recent decision in Murray v. United States, --- U.S. ----, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) is misplaced. The Murray holding is merely another example of the Supreme Court's attempts to limit the reach of the exclusionary rule in the fourth amendment context--a holding which the majority concedes is of limited relevance in the fifth amendment context. Cf. Kurzer, 534 F.2d at 516 ("[t]he Fifth Amendment, in contrast, is by its terms an exclusionary rule") (emphasis added). In any event, it is difficult to understand how the government's error in this case can be deemed harmless when in fact all of the "devastatingly incriminatory" evidence offered against Miron at trial was derived from the unlawful use of his immunized testimony.
 
 
 143
 Finally, I fear that the majority's acquiescence to the government's use of immunized testimony in this case will have serious implications for the future. The federal immunity statute, consistent with the privilege against self-incrimination, allows the government to compel the testimony of a witness by granting "use" immunity in exchange for that testimony. This "bargain" ensures that the fifth amendment privilege is preserved. See Apfelbaum, 445 U.S. at 130, 100 S.Ct. at 957; see also Braswell v. United States, --- U.S. ----, 108 S.Ct. 2284, 2294-95, 101 L.Ed.2d 98 (1988) (noting "serious consequences" that entail when government decides to grant "use" immunity since government must show in any subsequent prosecution that all evidence sought to be introduced was derived from legitimate independent sources). If, however, the government is allowed to violate the "bargain" by using immunized testimony--no matter how innocent, inadvertent or unwitting that use might be, cf. Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971)--the constitutional privilege will have been sacrificed. As a practical matter, this means that witnesses granted "use" immunity in the future will think twice about testifying truthfully (or at all) rather than run the risk that the government will later be able to use the "immunized" testimony against them. Absent enforcement of the "very substantial protection" afforded by the federal immunity statute against compulsory self-incrimination, Kastigar, 406 U.S. at 461, 92 S.Ct. at 1665, both law enforcement and the constitutional rights of immunized witnesses will most assuredly be impaired.
 
 CONCLUSION
 
 144
 In my judgment, the government's use of defendant's prior immunized testimony was a violation of the federal immunity statute and the fifth amendment and necessarily tainted whatever evidence was derived from that use. The fact that Miron's testimony had "no effect" on Judge Bramwell's decision to approve the April 8, 1983 wiretap is irrelevant. What is relevant is that Miron was convicted using tainted evidence in violation of the fifth amendment. Accordingly, because I would reverse the defendant's conviction and dismiss the indictment, I respectfully dissent.
 
 
 
 [1]
 That statute states:
 Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to ... a court or grand jury of the United States ... the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.
 
 
 [1]
 With regard to the alternative grounds advanced by the district court summarized in paragraphs numbered (5) and (6) of Judge Van Graafeiland's concurring opinion, I cannot agree that Miron was not "confronted by substantial and 'real' ... hazards of incrimination." Marchetti v. United States, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968) (citations omitted). While I can understand my colleague's reluctance to provide Miron with an "immunity bath," ante, 859 F.2d at 1088 (citation omitted), insulating him from prosecution "for a career of crime about to be launched," United States v. Freed, 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971), the "risk of incrimination [Miron] faced when forced to testify [before the grand jury in 1980] sufficiently encompassed the activity for which he was ultimately convicted." Appellant's Brief at 20. It is undoubtedly true that at the time Miron was given immunity for his testimony he could not have "contemplated the particular crimes of which he was convicted." Ante at 1088. Nevertheless, Miron's post-immunization activities were part of a continuing course of criminal conduct,Quatermain, 613 F.2d at 42; see United States v. Apfelbaum, 445 U.S. 115, 129, 100 S.Ct. 948, 956, 63 L.Ed.2d 250 (1980), which Judge Van Graafeiland concedes satisfies the Marchetti "substantial" and "real" hazard of incrimination test. See 390 U.S. at 53-54, 88 S.Ct. at 705-06 (rejecting "rigid chronological" premise that fifth amendment privilege is entirely inapplicable to prospective criminal acts in favor of standard considering substantiality of risk of incrimination)
 In support of its determination that the Port Mobil pipeline scheme involved future acts not encompassed by Miron's immunity, the district court noted that "[a]lthough the indictment dates 1967 as the beginning of the Gambino Family RICO conspiracy, it charges that Miron joined the RICO conspiracy only in or after January 1981." 671 F.Supp. at 137. The threat of incrimination was no less "real" or "substantial" because the government subsequently alleged that Miron's criminal participation commenced after the date of his grand jury testimony. The assertion of a constitutional privilege cannot depend on the government's choice of dates in an indictment. Although few things about RICO are clear, the statute surely is one aimed at continuing criminal conduct. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985); United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); United States v. Benevento, 836 F.2d 60, 72 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); United States v. Persico, 832 F.2d 705, 713-14 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988).